# Aluminum Co. of America v. Kemper International Insurance Co.

*Robert W. Doty, William H. Schorling, Mark C. Coulson,* for plaintiffs.

*Harding A. Orren, Robert M. Wattson, Samuel P. Gerace, C. Robert Keenan, III,* for defendants.

WEIR, *J.*, August 17, 1981—Plaintiffs in this case are Aluminum Company of America and Alcoa Steamship Company, Inc., (hereafter Alcoa) and the defendants are a group of insurance companies writing through Kemper International Insurance Company, F.M. Insurance Company, Ltd., and Industrial Risk Insurers (hereafter The Insurers). On March 30, 1981 a jury returned a verdict in favor of plaintiffs and against defendants in the amount of $2,500,000 which, with interest, became $3,135,750. Before the court en banc are defendants' motions for judgment n.o.v. and for a new trial. The motions are supported by 46 assignments of error, but all of these alleged errors which are of any consequence relate to a very few major areas of contention.

The incident which gave rise to this insurance claim occurred on January 2, 1977 when a huge ship ran head on into Alcoa's ore transfer facility in Tembladora, Trinidad with such force that its prow wedged its way into a concrete pier to a depth of 18 feet, and caused the destruction of an unloader

crane and a conveyor gallery which were among the principal operating units located on the pier. As the ship traveled forward into the pier, it pushed against the crane and dislodged it from its base and caused it to move backwards through and over the top of the conveyor gallery, and then upside down into the water on the far side of the pier. The operating parts of this large crane were supported by steel legs and an open network of innumerable steel members, so many of which were severely bent, twisted and distorted, that it became a jumbled mass of steel parts without structural integrity. The conveyor gallery was also supported by an open network of steel members which sustained similar damage as a result of the crane pushing against it and then on top of it. It is not in dispute that both facilities were reduced to a condition such that repair was not economically feasible. The insurance policies which are involved here cover damage to property from a number of specified perils including "collapse of buildings, structures or a material part thereof." They do not provide a definition of the word "collapse" although they contain a number of exclusions from recovery by collapse, none of which are applicable to the facts of this case. The Insurers paid Alcoa for the loss of the conveyor gallery on the basis of destruction by collapse, but they refused payment for the loss of the unloader crane on the ground that its destruction did not result from collapse. The paramount question in this case, and in reality the only issue of very great consequence, is whether or not the loss of the unloader crane is covered by the provision in the policies which indemnifies the insured against collapse of a structure or a material part thereof.

"Collapse" is both a noun and a verb, and in each of its roles it has a variety of applications. As a noun

it is used widely to describe undersirable physical and mental conditions of people, but dictionaries also apply it to inanimate things as indicating breakdown, ruin, or destruction. They also say that the noun covers the action of collapsing, thereby extending its meaning to those things of which the verb "to collapse" is descriptive, which includes falling into a jumbled mass through the force of external pressure which is precisely what happened here to the unloader crane.

The rationale of The Insurers in insisting upon a special meaning for "collapse" cannot be better illustrated than by their own actions in paying for the conveyor gallery and refusing payment for the unloader crane. As was said, both of these structures suffered the identical type of damage although somewhat less quantitatively in the case of the conveyor gallery. The Insurers view the destruction of the gallery as being from collapse because the principal force which caused it was the weight of the crane descending downward upon it, even though the crane first pushed against it horizontally, not to mention that the real operative force was that of the ship pushing horizontally. The Insurers construe "collapse" as a condition resulting from force from above or loss of support below which cause the top of a structure or thing to be pushed or fall in a generally vertical course toward the bottom of the structure or thing. If the structure or thing is pushed over from the side The Insurers do not deem it to be collapsed, regardless of the extent and nature of the destruction which ensues. We cannot agree with such a narrow and specialized construction of this common English word "collapse" and, contrariwise, we agree with the trial judge that the determination of whether or not a structure is in a state of collapse depends upon its condition after the accident in

which it is involved, irrespective of the nature or direction of the force or forces which caused the condition. The condition of the unloader crane after the accident in this case has been described heretofore, and to the trial judge it was clearly a condition of collapse, but, despite its obviousness to the judge, this was a factual matter for the jury. The jurors, in addition to testimony describing the damage, had the aid of a number of excellent photographs from various angles, and also the opinion of an expert who examined the unloader crane and said that it was subjected to permanent bending, deformation and twisting and buckling which caused it to lose structural integrity and collapse.

In addition to the argument of the defendants in respect to the meaning of "collapse" which is based upon The Insurers perception of its meaning, and which would appear to be a subjective perception in view of some of the meanings of the word which are contained in dictionaries, the defendants also press an objective argument in support of their position on this same subject. This latter argument is based mainly upon two opinions of the Supreme Court of Pennsylvania, namely, Skelly v. Fidelity Casualty Company of New York, 313 Pa. 202 (1933) and Kattelman v. National Union Fire Insurance Company, 415 Pa. 61, 202 A.2d 66, (1964), neither of which is similar to the case at bar in its facts.

Skelly involves a claim for double indemnity on a life insruance policy which provided such coverage if the bodily injury resulting in the death of the assured was received "in consequence of the collapse of the outer walls of a building while the assured is therein." A runaway railroad car jumped the track and ran through two first floor walls of a three-story addition to a hotel, causing the assured's death. However, the hole caused by the car and the dam-

age to the walls "comprised only a small part of the first story and basement wall area of the addition" and "the second and third story portion of the two walls as well as a part of the first story and basement thereof remained in their original position and intact" and ". . . the entire building remained standing, with the hole torn in the addition." Understandably, it was held that this was a building with a hole in it and not a collapsed building within the terms of the policy. In its discussion of this situation as being far removed from a collapse, the court quotes two definitions of "collapse" as contained in a dictionary, one of which is not pertinent to this case and the other of which includes "flattened" as an element of "collapse". The court does not say that there is no other possible meaning of "collapse", and we cannot construe the recitation of one of the numerous dictionary definitions of "collapse" as a holding of the Supreme Court that a thing is not "collapsed" unless it also is "flattened". Certainly, The Insurers have not insisted that flattening is a necessary element of collapse. The conveyor gallery was ruinously distorted but it was not flattened.

Kattelman, v. National Union Fire Insurance Company, supra, involves a claim for property damage to a building on the basis of collapse. The insurance policy covering the loss defined "collapse" as "Loss by collapse shall mean only physical injury or destruction of the described property resulting from the collapse of floor(s), wall(s), or roof(s) of the described building(s) but not collapse caused by or resulting from subsidence . . . ." The building was seriously damaged but remained standing and intact. However, there is no need for further factual detail since the damage was caused by subsidence which was specifically excluded as an insured peril. The only reason for mentioning Kattelman is that it cites Skelly and the definitions therein.

With respect to the main issue in this case, we agree with the trial judge and must reject defendants' motions.

The secondary matters raised in behalf of defendants are applicable only to the motion for a new trial. One of these is the proposition that there should be no recovery for the entire value of the unloader crane from collapse since there would be a point in time when it would be damaged by collision but not yet collapsed, and the structure which collapsed was less valuable than it had been before the damage which was inflicted by collision. This is a resourceful argument, and it was made to the jury as well as to the court. The one witness who actually observed the accident described it as a continuous event from the colliding of the ship until the unloader crane toppled over backwards into the water, and, while he did not estimate the time involved, this would necessarily be very brief. No authority is cited for separating damages in this manner, but the analogy is made with an automobile which is completely destroyed by collision and then bursts into flames. It is argued, and no doubt correctly, that the fire insurance on the car would not cover its value before the collision. Here, however, the situation is different. We do not have two separate destruction forces of collision and fire, but only a single continuous force. And, more importantly, the argument misses the point that as each structural member of the unloader crane became deformed it lost its structural integrity and was, therefore, collapsed under insurance policies which indemnify the owner against collapse of a structure "or a material part thereof."

Another contention in support of the motion for a new trial is the refusal of the trial judge to admit evidence that Alcoa could have purchased all risk in-

surance, which would have prevented any dispute about coverage with The Insurers. We find it almost incredible that it should be argued that an insurance contract should be interpreted on the basis of what is available in the world of insurance rather than by what is contained in the contract. Seemingly the argument is made on the ground that Alcoa is as sophisticated in the area of insurance as are The Insurers, but obviously this cuts both ways and can be taken to indicate that Alcoa was satisfied that the unloader crane was adequately covered.

It is urged also that the trial judge should have declared a mistrial because a group of jurors had conversation with a witness for plaintiffs, an incident which has been blown out of proportion. There were some very interesting exhibits in the case and the jurors were congregated near these when the witness was passing them in returning into the courtroom. The witness had gone to Tembladora and the jurors initiated the conversation by suggesting, facetiously of course, that this would be a nice trip for them, and the witness was responding by explaining that this was not the sort of pleasant place they were assuming it to be when the conversation was called to the attention of the tipstaff and stopped. None of the participants was aware of impropriety, and it was not the sort of thing which could have influenced the verdict.

The only other argument in favor of a new trial which we deem it necessary to discuss is the alleged error of the trial judge in instructing the jury on the matter of damages. This argument is somewhat difficult to comprehend. It was stipulated by the parties that the replacement value of the crane was $2,500,000 and this stipulation was entered into evidence. Fedas v. Insurance Co. of Pennsylvania, 300 Pa. 555, 151 A.2 285, (1930) and Farber v.

Perkiomen Mutual Insurance Co., 370 Pa. 480, 88 A.2d 776, (1952) say that actual cash value in an insurance policy, which is the measure of loss provided in the policies in this case, means the replacement cost of the insured object as of the date of its loss. Therefore, from a practical as well as a legal point of view, there would seem to be no purpose on the part of The Insurers in engaging in such a stipulation unless they intended and expected it to be the measure of loss if liability was first determined in favor of plaintiffs other than the point that the unloader crane was already damaged by collision before it collapsed. Except for this latter point, which has been discussed and rejected heretofore, it does not seem that the charge of the court on damages was significantly different from the position or the request of defendants.

## ORDER

And now, this August 17, 1981, in accordance with the opinion filed herewith, the motions of the defendants for judgment non obstante veredicto and for a new trial are hereby denied; judgment to be entered upon payment of the verdict fee.